

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| BLAKE BARBER,<br><br>Plaintiff,<br><br>vs.<br><br>ANTHONY MEIROSE, DALTON SANTANA, MATTHEW HOWER, and TIMOTHY DOYLE, Police Officers at Rapid City Police Department, in their Individual and Official Capacities,<br><br>Defendants. | 5:18-CV-05063-CBK<br><br>MEMORANDUM OPINION<br>AND ORDER |

In this civil rights action filed pursuant to 42 U.S.C. § 1983, plaintiff Blake Barber contends that defendants Detective Anthony Meirose, Officer Dalton Santana, Officer Matthew Hower, and Lieutenant Timothy Doyle violated his constitutional rights when they used excessive force against him during a lawful arrest. This matter is before the Court on defendants' Motion for Summary Judgment. The motion should be granted.

I. **Background**

Blake Barber and Nicole Noteboom have been in an on-and-off relationship for almost twenty years. Throughout that time, Noteboom obtained various protection orders against Barber, and Barber violated each one. On April 30, 2018, despite Noteboom's then-active protection order against Barber, Barber was living with Noteboom and their three children in her home, apparently with permission. After the couple got into an argument about Barber's infidelity, Noteboom told Barber he was no longer welcome in the home and Barber left. Believing that Noteboom had cooled off, Barber returned two days later to collect some of his clothes and see his children.[1] But Noteboom had not

---

[1] There are numerous instances where Barber contradicted his own affidavit during his deposition. When Noteboom's mother called law enforcement on behalf of Noteboom,

cooled off. She sent an SOS message from her cell phone that notified her mother, Sharyn Zebroski, that she was in distress, and Zebroski called law enforcement to the home.

Detective Meirose, Lieutenant Doyle, Officer Santana, and Officer Hower responded to the call and arrived around fifteen or twenty minutes after Barber's return with the understanding that Barber was present in violation of a domestic abuse protection order. This might seem to be a case where more officers than normal were sent. However, it is common knowledge that, other than perhaps an armed robbery in progress, officers responding to cases of domestic violence are often at great risk. The officers knocked on the door and, with the hope that the officers would go away, neither Noteboom nor Barber answered. After receiving no response at the door, Officer Hower called Zebroski back to gather more details on the SOS. See Doc. 35–1 at 4–5, Hower Police Report. Zebroski stated that Noteboom previously said if she sent an SOS, it was "the real deal." Id. The SOS included Noteboom's location at the time it was sent and showed that she was at home. Id. After receiving the SOS, Zebroski called Noteboom several times and sent several messages before Noteboom eventually answered. Id. Based on that call, Zebroski told Officer Hower that she believed Noteboom could not speak freely on the phone because Barber was in the home and preventing her from doing so. Id.

In the meantime, Barber put the children upstairs because he knew that he was about to be arrested and did not want his children to see it happen. Noteboom and Barber then went into a downstairs bathroom to await the officers' entry. Barber began

---

she told the officers that Barber recently was using methamphetamine. See Doc. 35–1 at 4–5, Hower Police Report. In Barber's affidavit, he stated that contrary to inferences and statements of others, he was not high and had not smoked methamphetamine before returning to Noteboom's home. Doc. 31 ¶ 13. But during his deposition, he stated that he was high on methamphetamine at the time he returned to the home. Doc. 51–1 at 44. In Barber's second Objections and Responses to Defendant's Additional Statements of Undisputed Fact Based on Plaintiff's Testimony, he concedes that he was high on methamphetamine when he returned to the home. Doc. 62 ¶ 83.

2

questioning Noteboom about who called law enforcement while Noteboom again questioned Barber about his infidelity. Eventually, the officers broke down the door and entered with their guns drawn. After finding Barber and Noteboom in the downstairs bathroom, they ordered Barber to come upstairs. Barber walked out of the bathroom and told the officers, "[S]hut the f—— up and I'll come up when I'm ready." Barber did not like being yelled at or having guns drawn on him, and further told the officers, "[I]f you're going to pull your trigger, pull your f——ing trigger, you p——."[2] After refusing the officers' commands to come upstairs, Barber went back into the downstairs bathroom, out of sight of the officers, to continue conversing with Noteboom. The two spoke about Barber's surrender, and shortly thereafter Noteboom walked up the stairs to the officers closely followed by Barber.

When Noteboom passed Detective Meirose on the staircase and walked safely to the other officers, Detective Meirose brought Barber to the ground on the staircase. Detective Meirose claims that he grabbed Barber's shoulder and pressured his back until Barber was on the ground. Barber claims that Detective Meirose picked him up by the back of his pants and belt and "body slammed" Barber face down onto the staircase before putting his knees into Barber's back. Detective Meirose stated that Barber tucked his right arm beneath him to prevent being handcuffed. According to Barber, he gave up, laid down, and was not actively resisting arrest by hiding his right arm. Barber testified, "They had my arms jacked up. They had their knees all over me. They had – they were hurting me," and, "They bombed their knees on me." Detective Meirose and Lieutenant Doyle handcuffed Barber and Officer Santana took him to a patrol car.

---

[2] There is an inconsistency regarding what Barber said to the officers. In his affidavit, Barber stated that "out of frustration [he] shouted up the stairs he would be there in a minute and if he didn't like that he could 'just shoot me.'" During Barber's deposition, in response to the question, "You told them just shoot me, right?", he responded, "I said, shut the f—— up or pull your trigger. I'll come up when I'm ready. I didn't tell him to shoot me. I told him to shut his f——ing mouth because he was yelling at me." Detective Meirose reported Barber shouting "just shoot me," and Lieutenant Doyle reported the statement "you're going to have to shoot me."

3

Barber concedes that he was in violation of a valid domestic abuse protection order that Noteboom obtained against him based on allegations of domestic violence and does not dispute the validity of the arrest. In Noteboom's January 16, 2018, protection order petition affidavit, she alleged Barber was using methamphetamine every day and she could not stop him from breaking into her home. See State of South Dakota, Petition and Affidavit for a Protection Order, 51TPO18–000057. She stated that Barber had lost control of himself and physically hit her many times and that he was angry and unpredictable while using methamphetamine. Id. She stated further that Barber's hope of talking to her to resolve their issues always led to him hitting her, and that Barber was also threatening suicide. Id.

## II.    Standards of Review

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; Bedford v. Doe, 880 F.3d 993, 996 (8th Cir. 2018). The United States Supreme Court has held that:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (internal quotations omitted).

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). That is, to make summary judgment inappropriate, there must be a factual dispute concerning facts the existence or nonexistence of which "'must be outcome determinative under prevailing law.'" Walls v. Petrohawk Props., LP, 812 F.3d 621, 625

(8th Cir. 2015) (quoting Grey v. City of Oak Grove, 396 F.3d 1031, 1034 (8th Cir. 2005)).

Thus, in accordance with Rule 56(c), the party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Upon such a showing, the burden shifts to the non-movant to present affirmative evidence, beyond the pleadings, showing that a genuine issue of material fact exists. Anderson, 477 U.S. at 256–57. To meet its burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the nonmovant must be able to "show there is sufficient evidence to support a jury verdict in their [sic] favor." Nat'l Bank of Com. v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir. 1999). After this exercise, "we view the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party." Northport Health Servs. of Arkansas, LLC v. Posey, 930 F.3d 1027, 1030 (8th Cir. 2019). "To show a genuine dispute of material fact, a party must provide more than conjecture and speculation." Zayed v. Associated Bank, N.A., 913 F.3d 709, 720 (8th Cir. 2019).

### III. Analysis

Barber asserts a § 1983 claim against the officers in their individual and official capacities for using excessive force during his arrest.[3] The officers argue that their actions were objectively reasonable and that they are entitled to qualified immunity. The officers also argue that Barber has failed to allege any facts to support a claim against the officers in their official capacity. The Court agrees.

#### a. The Officers in Their Individual Capacities

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). The

---

[3] In Barber's First Amendment Complaint, he discusses the Court's supplemental jurisdiction over a state-law claim under SDCL § 20-9-1. He never elaborates on that claim or makes a prayer for relief pursuant to South Dakota law.

plaintiff must first "identify the specific constitutional right allegedly infringed." Id. (quoting Graham v. Connor, 490 U.S. 386, 394 (1989)). Barber alleges a use of excessive force in apparent violation of both his Fourth Amendment rights and his Fourteenth Amendment rights. See First Amended Complaint, Doc. 43., ¶¶ 22–23, 31. But "the Fourteenth Amendment does not apply to excessive force claims involving arrests, which are appropriately reviewed under the Fourth Amendment." Jackson v. Stair, 944 F.3d 704, 709 (8th Cir. 2019) (citing Graham, 490 U.S at 394–95 (1989)). Because Barber's excessive force allegation arises from his arrest, it should be analyzed under the Fourth Amendment.

To show a violation of the Fourth Amendment in a § 1983 action, a plaintiff "must demonstrate a seizure occurred and the seizure was unreasonable."[4] Cravener v. Shuster, 885 F.3d 1135, 1138 (8th Cir. 2018) (quoting McCoy v. City of Monticello, 342 F.3d 842, 846 (8th Cir. 2003). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 1138 (quoting Graham, 490 U.S. at 396). Factors relevant to the inquiry include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Pollreis v. Marzolf, 9 F.4th 737, 747 (8th Cir. 2021) (quoting Graham, 490 U.S. at 396).

"Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." Kelsay v. Ernst, 933 F.3d 975, 980 (8th Cir. 2019) (quoting Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018) (per curiam) (internal quotation marks omitted)). "Qualified immunity is a shield from civil liability for officers whose conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Just v. City of St. Louis, 7 F.4th 761, 766 (8th Cir. 2021) (internal quotations omitted)

---

[4] Here, there is no dispute over whether there was a seizure.

(citations omitted). The test for qualified immunity has two parts: (1) "whether the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) whether the right was clearly established at the time of the deprivation." Ehlers v. City of Rapid City, 846 F.3d 1002, 1008 (8th Cir. 2016) (quoting Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012). "The court may consider these steps in any order, but '[u]nless the answer to both of these questions is yes, the defendants are entitled to qualified immunity.'" Torres v. City of St. Louis, 39 F.4th 494, 502–03 (8th Cir. 2022) (quoting Ehlers, 846 F.3d at 1008). "In order to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. at 505 (quoting Ehlers, 846 F.3d at 1008) (alteration in original) (citation omitted).

Because "[a]n officer may be held liable only for his or her own use of excessive force," courts must assess each officer's actions separately. McReynolds v. Schmidli, 4 F.4th 648, 655 (8th Cir. 2021) (quoting Smith v. City of Minneapolis, 754 F.3d 541, 547–48 (8th Cir. 2014). These cases do not address any obligations on officers to intervene in aggravated circumstances.

### i. Detective Meirose

Barber cannot show that Detective Meirose violated his Fourth Amendment rights by using an unreasonable amount of force during his arrest. Detective Meirose subdued Barber to arrest him for a felony violation of a protection order and domestic assault, which are serious crimes. At the time of the takedown, Barber was still in close proximity to Noteboom and was a risk to her safety. During the events preceding the arrest, Barber made remarks about the officers having to shoot him, which would cause reasonable officers to fear for their own safety. And although Barber may have not actively resisted arrest, he passively resisted by refusing to surrender and comply with the officers' demands. All three Graham factors favor the reasonableness of Detective Meirose's use of force.

Barber posed a threat to Noteboom's safety until Detective Meirose brought him to the ground on the staircase. In contending that he was not a threat, Barber describes

the events surrounding his arrest as a "game," suggesting that police officers know that he does not carry weapons and should know that he is not a threat to anyone. According to Barber, he was similar to the nonviolent misdemeanant in Small v. McCrystal who was tackled from behind without warning. 708 F.3d 997, 1005 (8th Cir. 2013). Of course, "[f]orce is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and post little or no threat to the security of the officers or the public." Id. (quoting Brown v. City of Golden Valley, 574 F.3d 491, 499 (8th Cir. 2009)). But here, officers were at the home responding to a felony protection order violation and a possible domestic assault—a crime endangering another. Because he closely followed her up the stairs, Barber was a threat to Noteboom until they were separated when Detective Meirose took Barber down. See Hosea v. City of St. Paul, 867 F.3d 949, 959 (8th Cir. 2017) (determining it was reasonable for an officer to tackle a defendant suspected of domestic violence when he was still in close proximity to the potential victim). Applying the first two Graham factors to these circumstances show that Detective Meirose's use of force was reasonable.

Further, Barber's statements to officers about pulling their triggers and having to shoot him would put reasonable officers in fear for the safety of themselves or others. Barber argues these statements are immaterial and out of context. In his view, the scene in the home showed "a calm non-threatening situation wherein an unarmed man is surrendering himself to the officers." Yet the officers were responding to a possible domestic assault involving a habitual protection order violator they believed to be high on methamphetamine. Even accepting Barber's statement that he was never violent and never resisted arrest as true, Noteboom stated in the protection order petition that Barber had discussed suicide. Detective Meirose reviewed the protection order when responding to the home and was already familiar with Barber. That understanding of Barber's mental state combined with the statements about the officers shooting him would cause any officer apprehension, even if Barber did not say "just shoot me." Indeed, Detective Meirose testified that after Barber remarked about the officers shooting him, "I don't know what his intentions are, if his intentions are suicide by cop or to have this turn into

8

some kind of possibly hostage rescue scenario at this point." Detective Meirose stated further, "[B]y his statement he's willing to say that, number one, he's not going to go kindly; number two, he is going to place me in a position that I have to act in order to save my life, the life of the officers, or the life of the innocents on scene." In response, Detective Meirose used a reasonable amount of force to take the aggressor into custody as soon as it was possible. While it "may appear, in the calm aftermath, that an officer could have taken a different course, . . . we do not hold the police to such a demanding standard." Estate of Morgan v. Cook, 686 F.3d 494, 497 (8th Cir. 2012) (quoting Gardner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996). Barber's statements would have put a reasonable officer in fear for his safety, further highlighting the second Graham factor as favoring Detective Meirose's use of force.

Barber argues that he has never run or attempted to escape and has always peacefully submitted to officers arresting him for protection order violations, and for that reason, any use of force was excessive. But "[t]he issue of reasonableness 'must be examined from the perspective of the facts known to the officer at the time of the incident.'" Molina-Gomes v. Welinski, 676 F.3d 1149, 1152 (8th Cir. 2012) (quoting Nelson v. Cnty. of Wright, 162 F.3d 986, 990 (8th Cir. 1998)). Detective Meirose knew that Barber had a propensity for running from the police. Indeed, Detective Meirose testified that the officers deliberately avoided using their radios to avoid tipping Barber off because Barber was known to listen to police scanners. Detective Meirose parked away from the home and jumped a fence to enter the backyard in order to ensure Barber could not escape and other officers surrounded the home. He then took Barber down to prevent an attempted escape that could have endangered the other officers and Noteboom.[5] Barber argues further that Detective Meirose's only stated objective for the

---

[5] Barber testified, "If I know – if I know they're coming and I can run and get away, then I run and get away. And that's what they're pissed off about. Because when I do – there has [sic] been instances in the past where they couldn't chase me down or I knew they were coming and I got out before they got there and they couldn't find me nowhere [sic]." Again, officers responded to the home to make a valid arrest, not play a game of hide and seek.

9

takedown was to prevent Barber from fleeing and that it was unreasonable given the circumstances for Detective Meirose to believe that Barber was going to attempt to escape after walking up the stairs. Even if that were true, the reasonableness of a use of force is evaluated objectively, "without regard to [an officer's] subjective intent or motivation." Williams v. City of Burlington, 27 F.4th 1346 (8th Cir. 2022) (quoting Loch v. City of Litchfield, 689 F.3d 961, 965 (8th Cir. 2012). As already stated, there are several other reasons that an objective officer would have used force to arrest Barber. Despite Barber's after-the-fact assertions of his intent to submit to arrest, Detective Meirose was faced with a known offender suspected of domestic assault and acted accordingly. Officers must act reasonably, not read minds.

  Even if Barber did not actively resist, Barber passively resisted commands to surrender and Detective Meirose used a reasonable amount of force to effectuate Barber's arrest. Barber's noncompliance began when he refused to answer the door when the officers knocked and continued when he told the officers he would surrender when he was ready. Of course, Barber's disrespectful words directed at the officers alone do not permit the use of force during his arrest. See Shannon v. Koehler, 616 F.3d 855, 865 ("[T]he use of any force by officers simply because a suspect is argumentative, contentious, or vituperative is not to be condoned."). Despite the undisputed facts, Barber contends that he "never refused to surrender" and the "modest brief deviation from immediate compliance" excuses his behavior. But "[t]he failure to follow police instruction may constitute passive resistance," Kohorst v. Smith, 968 F.3d 871, 876 (8th Cir. 2020), and "[w]hen a suspect is passively resistant, somewhat more force may reasonably be required," Wertish v. Krueger, 433 F.3d 1062, 1066 (8th Cir. 2006). Refusing to comply with an order to surrender would cause any reasonable officer to use a heightened amount of force to effectuate an arrest. Barber reiterates that he was unarmed, but that does not preclude the use of force. See Cravener, 885 F.3d at 1140 ("Unarmed, passively resisting subjects can pose a threat necessitating the use of taser force."). Based on the circumstances here, the third Graham factor also supports Detective Meirose's use of force.

10

To the extent that Barber contends that Detective Meirose used excessive force when handcuffing Barber, after the takedown, his argument fails. An officer is permitted to grab and put an arrestee in handcuffs when effectuating an arrest. See Kasiah v. Crowd Systems, Inc., 915 F.3d 1179, 1184 (8th Cir. 2019) (citing Graham, 490 U.S at 396). Here, officers were present to arrest Barber for the violation of a valid protection order and Barber does not contest the justification for the arrest. Barber states that his arm was stuck because Detective Meirose and Lieutenant Doyle were on top of him, but a reasonable officer could believe he was resisting and respond with force to handcuff him. See Carpenter v. Gage, 686 F.3d 644, 649 (8th Cir. 2012) ("Even if Carpenter's motive was innocent, the deputies on the scene reasonably could have interpreted Carpenter's actions as resistance . . . ."); Ehlers, 846 F.3d at 1011 ("[O]fficers at the scene reasonably could have interpreted Ehler's behavior of continuing to lay on his hands and refusing to comply with instructions as resistance and [used a taser]."). Even if Barber's arm was pinned beneath him and he was not purposefully resisting, "[h]andcuffing inevitably involves some use of force." Wertish, 433 F.3d at 1067.

If Detective Meirose did use excessive force, he did not violate any clearly established Fourth Amendment right. Barber cites various cases to support his argument, but none of them clearly establish that Detective Meirose's takedown constituted excessive force. As previously stated, it is clearly established that force is least justified against nonviolent misdemeanants who do not flee, resist arrest, or pose a danger to officers or the public. See Karels v. Storz, 906 F.3d 740, 747 (8th Cir. 2018); Rokusek v. Jansen, 899 F.3d 544 (8th Cir. 2018); Tatum v. Robinson, 858 F.3d 544, 548 (8th Cir. 2017); Small, 708 F.3d at 1005; Shekleton v. Eichenberger, 677 F.3d 361, 367 (8th Cir. 2012); Montoya v. City of Flandreau, 669 F.3d 867, 873 (8th Cir. 2012); Johnson v. Carroll, 658 F.3d 819, 827 (8th Cir. 2011); Brown, 574 F.3d at 499. Here, Barber was suspected of domestic assault, which is a violent felony. Also as previously recognized, it is clearly established that force is not appropriate on the sole basis that a suspect is rude to or argumentative with an arresting officer. See Bauer v. Norris, 713 F.2d 408, 412 (8th Cir. 1983); Shannon, 616 F.3d at 865. Detective Meirose arrested Barber for a

11

felony violation of a protective order and suspected domestic assault, not because of Barber's rude remarks.

Hosea v. City of St. Paul suggests that Detective Meirose's takedown was not a clearly established excessive use of force. In Hosea, officers responded to a 911 hang-up and, believing that there was a domestic dispute taking place, walked into the home. 867 F.3d at 953. The officers did not announce their entry and ordered the suspect to get on the ground. Id. The suspect did not immediately comply because he did not recognize the officers as the police. Id. When the suspect began lowering himself to the ground, one of the officers "tackled" the suspect or "jumped on [his] back," injuring his right hand. Id. The court found that the officers force was not excessive because a reasonable officer could have concluded the defendant committed or was committing domestic assault, which is a crime threatening the safety of another. Id. at 957. Although the defendant was in the process of getting on the ground, the force was not unreasonable because he was not fully on the ground and was still near the suspected victim. Id. at 958. Even if the officers mistakenly believed the defendant was resisting arrest after he began lowering himself to the ground, a reasonable officer could have concluded that he was still a threat to the victim's safety. Id. at 959. Here, the factual scenario is similar enough to Hosea such that a reasonable officer would believe that taking Barber to the ground in the manner that he alleges would be a reasonable use of force.

Based on the Graham factors, there is no genuine issue of material fact regarding the reasonableness of Detective Meirose's use of force to arrest Barber. Even if he did use excessive force, Detective Meirose is entitled to qualified immunity because the law was not clearly established at the time of the violation. Summary Judgment on Barber's claim against Detective Meirose should be granted.

### ii. Lieutenant Doyle, Officer Santana, and Officer Hower

Lieutenant Doyle did not use excessive force during Barber's arrest and cannot be held liable for Detective Meirose's actions, even if Detective Meirose did use excessive force. Barber seemingly concedes that Lieutenant Doyle was not involved in the takedown, and his involvement in the arrest was limited to handcuffing Barber once he

was already on the ground. For the same reasons stated above in relation to Detective Meirose, the force Lieutenant Doyle used to help handcuff Barber was reasonable.

Additionally, while it is true that the Eighth Circuit recognizes an officer can be held liable for failing to intervene to stop another officer from using excessive force, see Nance v. Sammis, 586 F.3d 604, 612 (8th Cir. 2009), and for conspiring to use excessive force, see Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999), both of those claims must be pleaded in the plaintiff's complaint, see Johnson v. Carroll, 658 F.3d 819, 828 n.2 (8th Cir. 2011). Barber did not allege a failure-to-intervene or a conspiracy claim against Lieutenant Doyle, and he cannot be held liable on that basis even if Detective Meirose did use excessive force.

Officer Santana and Officer Hower did not use excessive force during Barber's arrest and cannot be held liable for Detective Meirose's or Lieutenant Doyle's actions, even if one or both such officers did use excessive force. Barber has alleged no facts to suggest that Officer Santana or Officer Hower used excessive force at any time during the arrest. According to Officer Santana, his only interaction with Barber was walking Barber to the patrol car after he was handcuffed and then transporting him to the county jail. Officer Hower's on scene activities appear to be limited to communicating with Noteboom's mother over the phone before the officers entered the home and handling a Police K9. Barber similarly did not allege a failure-to-intervene or a conspiracy claim against Officer Santana and Officer Hower, and they cannot be held liable for Detective Meirose or Lieutenant Doyle's actions.

Accordingly, Summary Judgment on Barber's claims against Lieutenant Doyle, Officer Santana, and Officer Hower should be granted because Barber failed to show that any of these three officers used excessive force during his arrest or thereafter.

### b. The Officers in Their Official Capacities

An official capacity claim against an individual is actually a claim "against the governmental entity itself." White v. Jackson, 865 F.3d 1064, 1075 (8th Cir. 2017). "A plaintiff who sues public employees in their official, rather than individual, capacities sues only the public employer and therefore must establish the municipality's liability for

the alleged conduct." Kelly v. City of Omaha, 813 F.3d 1070, 1075 (8th Cir. 2016). Municipal liability under § 1983 for a constitutional violation may only attach if the violation "resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." Mick v. Raines, 833 F.3d 1075, 1079 (8th Cir. 2018) (quoting Corwin v. City of Independence, 829 F.3d 695, 699 (8th Cir. 2016)).

Barber has failed to show that his constitutional rights were violated as a result of any official municipal policy. A policy is "an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." Corwin, 829 F.3d at 700. Barber does not plead any facts that suggest the Rapid City Police Department's use of force policy is unconstitutional on its face or that the "inadequacies of the policy were a product of deliberate or conscious choice by policymakers" such that the policy constitutes deliberate indifference to constitutional rights. See Szabla v. City of Brooklyn Park, 486 F.3d 385, 390 (8th Cir. 2007) (en banc).

Barber has also failed to show that his constitutional rights were violated as a result of a custom. A plaintiff can establish municipal liability through an unofficial custom by showing "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." Corwin, 829 F.3d at 700 (quoting Snider v. City of Cape Girardeau, 752 F.3d 1149, 1160 (8th Cir. 2014)). Barber has alleged no facts sufficient to meet this test.

Finally, Barber has failed to show that his constitutional rights were violated as a result of a deliberately indifferent failure to train or supervise. A municipality can be held liable for failure to train or supervise employees when: (1) the city's hiring and training practices are inadequate; (2) the city was deliberately indifferent to the rights of

others in adopting them, such that the failure to train reflects a deliberate or conscious choice; and (3) an alleged deficiency in the city's hiring or training procedures actually caused the plaintiff's injury. Parrish v. Ball, 594 F.3d 993, 997 (8th Cir. 2010) (quoting Andrews v. Fowler, 98 F.3d 1069, 1075 (8th Cir. 1996)). Barber provides no evidence sufficient to meet this test.

Accordingly, Summary Judgment on Barber's claims against the officers in their official capacities should be granted because he has failed to show that his injury resulted from an official policy, custom, or deliberately indifferent failure to train.

Now, therefore,

IT IS ORDERED, as follows:

1) Summary judgment is granted against plaintiff as to claims against Anthony Meirose in his individual and official capacity, there being no genuine issues of any material fact.
2) Summary judgment is granted against plaintiff as to claims against Dalton Santana, Matthew Hower, and Timothy Doyle in their individual and official capacities, there being no genuine issues of material fact.
3) Costs shall be taxed by the clerk against plaintiff.

DATED this 20th day of September, 2022.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge